John H. **GRANDITS**, et al., Plaintiffs,

v.

**UNITED STATES**, Defendant.

Nos. 96–480C, 96–4801C.

United States Court of Federal Claims.

June 23, 2005.

Timothy B. Hannapel, Assistant Counsel, Irene N. Pantelis, Assistant Counsel, Larry J. Adkins, Deputy General Counsel, Gregory O'Duden, General Counsel, National Treasury Employees Union, Washington, D.C., for the representative plaintiff, Mr. Grandits.

Douglas K. Mickle, Trial Attorney, Bryant G. Snee, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for the defendant. Arthur I. Rettinger, Office of Chief Counsel, Bureau of Customs and Border Protection, of counsel.

## OPINION

HORN, Judge.

### BACKGROUND

The former captions for this case were *Lawrence Abramson, et al. v. United States,* No. 96–480C and *John Agbayani, et al. v. United States,* No. 96–4801. Both Mr. Abramson and Mr. Agbayani have settled their claims against the government. Therefore, the parties proposed and the court adopted the new caption shown above, *John H. Grandits, et al. v. United States,* 96–480C, 96–4801C. The parties also proposed Mr. Grandits as a representative plaintiff to assist towards the resolution of the numerous pending overtime claims by multiple plaintiffs, filed pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219 (2000). The parties have worked well together, and under the court's supervision, have made progress towards settlement of the cases brought by certain of the plaintiffs encompassed in the above numbered cases. The parties have filed cross-motions for partial summary judgment regarding Mr. Grandits.

The United States Customs Service (Customs)[1] paid Mr. Grandits and other plaintiffs overtime compensation at a time and one-half rate, but not at the higher FLSA overtime rate. Instead, overtime was paid at the lower Federal Employment Pay Act (FEPA) rate, 5 U.S.C. § 5542(a)(2) (2000), which is capped at one and one-half times the rate of a Grade GS–10, step 1 employee. The issues addressed in this opinion are whether the United States Customs Service correctly applied the "administrative" exemption from the overtime pay provisions in the FLSA to

---

1. The United States Customs Service previously was a bureau of the United States Department of Treasury. On January 24, 2003, the Department of Homeland Security was created and, on March 1, 2003, Customs was transferred to the new department. Within the Department of Homeland Security, Customs, the Border Patrol, portions of the Immigration and Naturalization Service, and the Animal and Plant Health Inspection Service were formed into the Bureau of Customs and Border Protection (CBP). References in this opinion will be to "Customs."

Mr. Grandits as a Grade GS–1889–12 Import Specialist, and whether Customs correctly applied the "administrative" and the "professional" exemptions from the overtime provisions of the FLSA to Mr. Grandits as a Grade GS–1889–13 Import Specialist.

The FLSA overtime provisions state that:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The FLSA covers federal employees. *See* 29 U.S.C. § 203(e)(2)(A)(ii).

There are, however, specifically listed exemptions to the FLSA section 207 overtime provisions. In pertinent part, 29 U.S.C. § 213(a)(1) provides that the provisions of section 207 do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity ...." If an employee is exempt from the FLSA, that employee will be compensated for overtime work under the FEPA rate set forth in 5 U.S.C. § 5542(a). Section 5542(a) states:

(1) For an employee whose basic pay is at a rate which does not exceed the minimum rate of basic pay for GS–10 ..., the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of basic pay of the employee, and all that amount is premium pay.

(2) For an employee whose basic pay is at a rate which exceeds the minimum rate of basic pay for GS–10 ..., the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of the minimum rate of basic pay for GS–10 ... and all that amount is premium pay.

5 U.S.C. § 5542(a).

The cases were originally filed in the United States District Court for the Eastern District of Pennsylvania, No. 91–CV–5629, and subsequently transferred to the Court of Federal Claims. This court issued an earlier opinion in the case, *Abramson v. United States*, 42 Fed.Cl. 621 (1998), which denied defendant's RCFC 12(b)(1) motion to dismiss based on subject matter jurisdiction. The court concluded that plaintiffs should not be barred from filing their claims in the Court of Federal Claims even though the claims were originally covered by a negotiated grievance procedure. *Id.* at 632. The parties have filed cross-motions for partial summary judgment on Mr. Grandits' claims. This opinion addresses only liability issues.

## FINDINGS OF FACT

Mr. Grandits is a Customs Import Specialist, Series GS–1889. Mr. Grandits assesses customs duties and associated taxes on imported products, and ensures compliance with regulatory requirements. The parties have stipulated that Import Specialists such as Mr. Grandits classify imported products, appraise the value of the imported products and determine the customs duty and internal revenue tax. Import Specialists also perform "trade-related" functions, such as verification of trade statistical information, protection of domestic industry from unfair foreign competition, facilitation of trade programs, and enforcement of regulatory requirements pertaining to particular products (e.g., trademark and patent right protection and protection of endangered species). Import Specialists also request financial audits and criminal investigations by other agencies when fraud is suspected.

The Import Specialist series starts at Grade 5, which is an entry-level training position. Employees typically spend a year at each grade level until Grade 11 is reached. Grade 11 is considered a journeyman level. Grades 12, 13, and 14 are filled through a competitive selection process. Only Grades 12 and 13 are at issue in the present case. The Grade 12 Import Specialist acts as a local expert and Team Leader, directing and prioritizing the workload of the team. The Grade 12 Import Specialist position description lists the following duties: assigning trade entries pertaining to imports for review

among team members; classifying products for the tariff and appraising the value of the products; reviewing and making recommendations on protests submitted by importers; providing technical advice and training; including determinations on regulatory requirements, such as the North American Free Trade Agreement (NAFTA), quota restrictions, Generalized Preferences, anti-dumping and countervailing duties, trademark and patent right enforcement actions, and environmental protection actions; providing technical information to Customs Fines and Penalties Officers; and providing advice to importers on prospective imports. The duties of the Grade 13 Import Specialist are similar to Grade 12 duties, except that the Grade 13 position is known as the Field National Import Specialist (FNIS). The FNIS is authorized to issue binding rulings and pre-classification rulings on prospective importations. The Grade 14 Import Specialist, which is not at issue in the present case, is known as the National Import Specialist (NIS). An employee at the Grade 14 level issues binding rulings, and is the final level of appeal for classification decisions on imported products. The parties have stipulated that Customs has classified Import Specialists at Grade 11 and below as nonexempt from the overtime provisions of the FLSA, while Import Specialists at Grade 12 and above are classified as exempt from the overtime provisions of the FLSA.

Mr. Grandits began his career in 1971 as a Grade 7 Import Specialist at the Customs Buffalo–Niagara Falls, New York port of entry. He became a Grade 9 Import Specialist in 1972, a Grade 11 in 1973, a Grade 12 in 1989, and then a Grade 13, his present grade, in 1999. Mr. Grandits has been identified by the parties to this litigation as a representative plaintiff, having served as both a GS–1889–12 Team Leader Import Specialist and as a GS–1889–13 Field National Import Specialist (FNIS). The parties have stipulated that Mr. Grandits' GS–12/13 duties include:

spending about 40% of his time reviewing entries for discrepancies and anomalies

and identifying priorities and designing strategies to prioritize the review of entries according to Customs' policies and procedures. The rest of his time is divided approximately equally among the other tasks of his grade level such as handling protests, serving as commodity expert, informing members of the public about regulatory requirements; managing port accounts; and conducting verifications of imported goods claiming NAFTA consideration. All of Mr. Grandits' work is subject to the final review of the Supervisory Import Specialist.

When imports arrive at port, they have been pre-classified by the importer. The information on the products is entered into the Customs electronic system. Import Specialists retrieve the electronic information and review trade entries pertaining to imports for compliance with the Harmonized System of Tariffs.[2] Imports are classified under the tariff system for the purpose of duty assessment and import restrictions. Mr. Grandits reviews the trade entries from the tariff schedule as prepared by or for the importer and submitted to Customs for discrepancies which may have resulted in a misclassification or misevaluation under the tariff, including compliance with regulatory requirements, treaties such as NAFTA and special trade programs. At the oral argument on the cross-motions for summary judgment, defendant's counsel stated that compliance with the tariff schedule and collecting tariffs were the goals/mission of the agency to be accomplished.

When Mr. Grandits discovers what he believes to be a discrepancy from the Tariff Schedule in an importer's submission, he reviews Customs databases, gathers information and produces the results of his review. Mr. Grandits prioritizes the work of his team in accordance with high profile programs and policies such as NAFTA and the Customs–Trade Partnership Against Terrorism. Importers may submit protests challenging decisions by Import Specialists. Mr. Grandits

---

2. The Harmonized Tariff Schedule of the United States, United States International Trade Commission (USITC), Publication 3653 (2004), is found at www.usitc.gov; *see also What Every* *Member of the Trade Community Should Know About Tariff Classification, United States Customs and Border Protection* (May 2004), found at www. cbp.gov.

makes recommendations on protests to his Supervisory Import Specialist for approval. Mr. Grandits has developed expertise in his particular product lines, industrial equipment, and provides training and assistance in this area to other Customs personnel and guidance to the importers. He also is authorized to issue binding rulings and pre-classification rulings in his area of expertise, industrial equipment; however, such rulings have become rare and are not part of his day to day duties as importers have gained experience with the tariff system.

The parties also have stipulated that:

Mr. Grandits does not have any personnel, staffing or budgeting authority. He does not approve leave or overtime requests, lacks the authority to discipline team associates, cannot shift staff to accommodate higher workloads, and does not issue performance appraisals. Only the Supervisory Import Specialists have authority to execute such personnel matters. Although Mr. Grandits has no role in the agency's staffing and budgeting processes, he may notify his supervisor when he believes additional staff is needed.

## DISCUSSION

The parties have filed cross-motions for summary judgment on the plaintiff's complaint pursuant to RCFC 56. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.

Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 317 F.3d 1331 (Fed.Cir.2003); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the

motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result. *Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *see also United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood*

*v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines. Inc. v. United States*, 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir.2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA. Inc. v. Cayetano*, 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not

establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States*, 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *De-Marini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir.2001); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). In the present case, both parties believe that there are no material facts in dispute. The parties have filed an extensive, joint stipulation of facts with supporting documents, cross-motions for summary judgment with supporting briefs and exhibits and participated in an oral argument on the cross-motions. The court concurs with the parties that there are no material facts in dispute, and no additional facts are necessary to resolve the issues presented, which, therefore, can be resolved on summary judgment motion.[3]

With respect to Mr. Grandits and others in the lawsuit, defendant claims administrative and professional exemptions from the FLSA overtime provisions. *See* 29 U.S.C. § 213(a)(1); 5 C.F.R. § 551.206 (Jan. 1, 2005) (administrative exemption); 5 C.F.R. § 551.207 (Jan. 1, 2005) (professional exemp-

tion). Mr. Grandits began working for Customs in 1971. In 1974, Congress amended the Fair Labor Standards Act of 1938 to include employees of the federal government. *See* 29 U.S.C. § 203(e)(2)(A)(ii); *Billings v. United States*, 322 F.3d 1328, 1333 (Fed.Cir.), *cert. denied sub nom. Lotz v. United States*, 540 U.S. 982, 124 S.Ct. 465, 157 L.Ed.2d 372 (2003); *Am. Fed'n of Gov't Employees, AFL-CIO v. OPM*, 821 F.2d 761, 769 (D.C.Cir. 1987); *Lanehart v. Horner*, 818 F.2d 1574, 1575 (Fed.Cir.1987); *Zumerling v. Devine*, 769 F.2d 745, 746 (Fed.Cir.1985). Mr. Grandits seeks overtime as a GS–12 and also as a GS–13 employee of Customs.

The Office of Personnel Management (OPM) is charged with responsibility for the administration of the FLSA for federal employees. *See* 29 U.S.C. § 204(f) (2000) (enumerating certain exceptions not applicable in the present case); 5 C.F.R. § 551.102(a) (Jan. 1, 2005). OPM's 1989 regulations, the year Mr. Grandits became a GS–12 Team Leader, provided that:

> In all exemption determinations, the agency shall observe the principles that–
>
> (a) Exemption criteria shall be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption.
>
> (b) The burden of proof rests with the agency that asserts the exemption.
>
> (c) All employees who clearly meet the criteria for exemption must be exempted.

---

**3.** The United States Court of Appeals for the Federal Circuit, in the case of *Berg v. Newman*, 982 F.2d 500, 501 (Fed.Cir.1992), reviewed the grant of summary judgment by a federal district court in favor of the government. The Federal Circuit reversed the grant of summary judgment due to the scarcity of specific evidence in the record of the day to day work of the claimants. *Id.* at 503. The Federal Circuit stated that: "To determine whether a position fits within the exemption, a trial court must have before it sufficient facts concerning the daily activities of that position to justify its legal conclusion." *Id.* The record reviewed by the federal district court in *Berg* had consisted only of position descriptions and conclusory statements from agency classifiers. *Id.*

In contrast, in the present case, the parties have submitted for the record 35 pages of stipulated facts, supported by 358 pages of documents, including the complete sworn deposition

testimony of Mr. Grandits and his supervisor, Mr. Lipp. The parties also have submitted principal, response and reply briefs, and supplemental filings, including a declaration by Mr. Grandits in addition to the transcript from Mr. Grandits's deposition, which include information on the work performed by Mr. Grandits as both a GS–12 and GS–13 and the 2300–plus page Harmonized Tariff Schedule with commentary tying the Tariff Schedule to Mr. Grandits' specialty of industrial equipment. Unlike the record in the *Berg* case reviewed by the Federal Circuit, in the case currently under review, this court is of the opinion that there are no material facts in dispute and no necessity for an evidentiary hearing, which the court finds would replicate the material already in the record before the court. Therefore, it is the opinion of the undersigned that unlike in the *Berg* case, disposition by summary judgment is appropriate in the present case.

5 C.F.R. § 551.202 (Jan. 1, 1989). OPM's 1989 regulations further provided that any employee properly classified as a GS–4 or below shall be nonexempt (and thus eligible for FLSA overtime), while employees properly classified at the GS–5 through GS–10 level shall be exempt (and thus not eligible for overtime) only if the executive, administrative or professional exemptions applied. 5 C.F.R. § 551.203(a), (b) (Jan. 1, 1989).

Mr. Grandits became a GS–13 Field National Import Specialist in 1999. OPM's 1999 (and current) regulations provide consistent, but additional, guidance to the above 1989 regulations:

> In all exemption determinations, the agency must observe the following principles: (a) Each employee is presumed to be FLSA nonexempt unless the employing agency correctly determines that the employee clearly meets one or more of the exemption criteria of this subpart and such supplemental interpretations or instructions issued by OPM.
>
> (b) Exemption criteria must be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption.
>
> (c) The burden of proof rests with the agency that asserts the exemption.
>
> (d) An employee who clearly meets the criteria for exemption must be designated FLSA exempt. If there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee should be designated FLSA nonexempt [and is, thereby, eligible for overtime pay].

5 C.F.R. § 551.202(a)-(d) (Jan. 1, 1999 and Jan. 1, 2005). OPM's 1999 (and current) regulations provide that GS–5 "or above" employees, such as Mr. Grandits, are exempt from entitlement to FLSA overtime only if an exemption applies. 5 C.F.R. § 551.203(b) (Jan. 1, 2005); *see also Berg v. Newman*, 982 F.2d at 503 ("The Government has the burden to show that appellants meet the criteria for the administrative exemption.") (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)); *Bates v. United States*, 51 Fed.Cl. 460, 462 (2002), *aff'd sub nom. Billings v. United States*, 322 F.3d 1328 (Fed.Cir.2003);

*Aamold v. United States*, 39 Fed.Cl. 735, 739 (1997) ("Not only must defendant prove each specific element of the exemption [from FLSA overtime], but courts are to interpret the FLSA overtime provisions liberally and the exemptions narrowly.") (citing *Walling v. Gen. Indus. Co.*, 330 U.S. 545, 547–48, 67 S.Ct. 883, 91 L.Ed. 1088 (1947) and *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)); *Adam v. United States*, 26 Cl.Ct. 782, 785–86 (1992).

In this opinion, the court will adhere to the following outline in addressing whether or not Mr. Grandits meets the tests for either the administrative or professional exemptions:

I. *Administrative Exemption*

  A. *GS–12 Import Specialist—Administrative Exemption*

    1. *Nonmanual Work Test*

    2. *Discretion and Independent Judgment Test*

    3. *Primary Duty Test*

  B. *GS–13 Import Specialist—Administrative Exemption*

    1. *Nonmanual Work Test*

    2. *Discretion and Independent Judgment Test*

    3. *Primary Duty Test*

II. *Professional Exemption*

  A. *GS–13 Import Specialist—Professional Exemption*

    1. *Intellectual and Varied Work Test*

    2. *Discretion and Independent Judgment Test*

    3. *Primary Duty Test*

      a. *Specialized Education or Training and Experience*

      b. *Work Comparable to that Performed by Professional Employee*

I. *The Administrative Exemption*

■ The applicable regulation regarding the administrative exemption reads as follows:

> An *administrative employee* is an advisor or assistant to management, a representative of management, or a specialist in a

management or general business function or supporting service and meets all four[4] of the following criteria:

(a) *Primary duty test.* The primary duty test is met if the employee's work–

(1) Significantly affects the formulation or execution of management programs or policies; or

(2) Involves management or general business functions or supporting services of substantial importance to the organization serviced; or

(3) Involves substantial participation in the executive or administrative functions of a management official.

(b) *Nonmanual work test.* The employee performs office or other predominantly nonmanual work which is–

(1) Intellectual and varied in nature; or

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

(c) *Discretion and independent judgment test.* The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

5 C.F.R. § 551.206 (Jan. 1, 2005) (emphasis in original).[5]

A. *GS–12 Import Specialist—Administrative Exemption*

1. *Nonmanual Work Test*

To meet the requirements of the nonmanual work test, defendant must show that Mr. Grandits performed predominantly nonmanual work, which was either (1) intellectual and varied, or (2) of a specialized or technical nature, requiring considerable special training, experience and knowledge. 5 C.F. R.

§ 551.206(b)(1), (2). Work of an intellectual nature is defined in the OPM regulations as

work requiring general intellectual abilities, such as perceptiveness, analytical reasoning, perspective, and judgment applied to a variety of subject matter fields, or work requiring mental processes which involve substantial judgment based on considering, selecting, adapting, and applying principles to numerous variables. The employee cannot rely on standardized application of established procedures or precedents, but must recognize and evaluate the effect of a continual variety of conditions or requirements in selecting, adapting, or innovating techniques and procedures, interpreting findings, and selecting and recommending the best alternative from among a broad range of possible actions.

5 C.F.R. § 551.104 (Jan. 1, 2005). The parties have stipulated that Mr. Grandits' jobs as a GS–12 and 13 involve reviewing paperwork filed by the importers or their brokers to determine the accuracy of those documents. In reviewing these documents Mr. Grandits reviews the classification of imports into the most appropriate category under a preset, detailed, tariff classification system. The court concludes that Mr. Grandits' work as a GS–12 met the nonmanual work test for an administrative exemption because the work was of an intellectual and varied nature. The plaintiff acknowledges that defendant meets the nonmanual work test, but disputes the final two tests required for an administrative exemption: the discretion and independent judgment test and the primary duty test.

Defendant also argues that the nonmanual work test was met because Mr. Grandits' work required considerable specialized training. The nonmanual work test also can be

---

**4.** The fourth test, called the "80–percent test," provides that employees must spend at least 80 percent of a representative work week on administrative functions. 5 C.F.R. § 551.206(d). The 80–percent test, however, by its language applies only to the GS–5 and GS–6 grades and, therefore, is not applicable to the present case. Plaintiff acknowledges the inapplicability of the 80–percent test.

**5.** The criteria for the administrative exemption is found in OPM's 1989 regulations at 5 C.F.R.

§ 551.205, with no substantive deviation in language from the version set out above from OPM's 2005 regulations at 5 C.F.R. § 551.206. Nor is there any substantive variation in OPM's 1999 version of the administrative exemption at 5 C.F.R. § 551.206 from the 2005 regulations. Both parties cite to later versions of the OPM regulations, which the court also will follow in reviewing the claimed exemptions from entitlement to FLSA overtime.

satisfied by work which is "[o]f a specialized or technical nature that requires considerable special training, experience, and knowledge." 5 C.F.R. § 551.206(b)(2). Work of a specialized or technical nature is defined in the OPM regulations as

> work which requires substantial specialized knowledge of a complex subject matter and of the principles, techniques, practices, and procedures associated with that subject matter field. This knowledge characteristically is acquired through considerable on-the-job training and experience in the specialized subject matter field, as distinguished from professional knowledge characteristically acquired through specialized academic education.

5 C.F.R. § 551.104. An inquiry into specialized knowledge [6] is unnecessary since Mr. Grandits met the nonmanual work test by virtue of performing work which is intellectual and varied, as discussed above.

### 2. Discretion and Independent Judgment Test

Defendant argues that: "The employee [Mr. Grandits] frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work." 5 C.F.R. § 551.206(c). The OPM regulations elaborate on the definitions:

> Discretion and independent judgment means work that involves comparing and evaluating possible courses of conduct, interpreting results or implications, and independently taking action or making a decision after considering the various possibilities. However, firm commitments or final decisions are not necessary to support exemption. The "decisions" made as a result of the exercise of independent

judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decisions are subject to review, and that on occasion the decisions are revised or reversed after review, does not mean that the employee is not exercising discretion and independent judgment of the level required for exemption. Work reflective of discretion and independent judgment must meet the three following criteria:

(1) The work must be sufficiently complex and varied so as to customarily and regularly require discretion and independent judgment in determining the approaches and techniques to be used, and in evaluating results. This precludes exempting an employee who performs work primarily requiring skill in applying standardized techniques or knowledge of established procedures, precedents, or other guidelines which specifically govern the employee's action.

(2) The employee must have the authority to make such determinations during the course of assignments. This precludes exempting trainees who are in a line of work which requires discretion but who have not been given authority to decide discretionary matters independently.

(3) The decisions made independently must be significant. The term "significant" is not so restrictive as to include only the kinds of decisions made by employees who formulate policies or exercise broad commitment authority. However, the term does not extend to the kinds of decisions that affect only the procedural details of the employee's own work, or to such matters as deciding whether a situation

---

**6.** One of the criteria for the primary duty test of the professional exemption, discussed below, involves "specialized education or training and experience which has provided both theoretical and practical knowledge of the specialty, including knowledge of related disciplines and of new developments in the field ...." 5 C.F.R. § 551.207(a)(1). The court finds below that Mr. Grandits does not meet the primary duty test of the professional exemption through this avenue or any other. The language of one criteria in the administrative exemption formula for the nonmanual work test, as noted above, is not identical to the professional exemption language quoted, but speaks of work "[o]f a specialized or technical nature that requires considerable special training, experience, and knowledge." 5 C.F.R. § 551.206(b)(2). There may be some nexus between these two concepts, drawn from different tests and different exemptions. Nevertheless, it is not inconsistent to meet the nonmanual test of the administrative exemption, based on work which is intellectual and varied, and to fail the primary duty test of the professional exemption, for the specific reasons addressed in detail below.

does or does not conform to clearly applicable criteria.

5 C.F.R. § 551.104 (emphasis in original).

In support of its argument that this element is satisfied, defendant's principal brief refers to language from the position description of the Grade 12 Import Specialist. The GS–12 Import Specialist, for example, "[p]lans[,] conducts and controls review, analysis, and processing of formal entries pertaining to assigned line of merchandise." Mr. Grandits' position description is of interest to the court, however, it is his actual, day to day performance of duties which are dispositive for purposes of exemption from the FLSA. In this regard, OPM regulations provide that: "The designation of an employee as FLSA exempt or nonexempt ultimately rests on the duties actually performed by the employee." 5 C.F.R. § 551.202(i);[7] *see also Berg v. United States,* 982 F.2d at 502, 503 ("This [OPM] regulation [on the administrative exemption from the FLSA] requires an examination of the day-to-day work of an employee.... The general job description lacks specific facts about appellants' [the employees'] day-to-day activities.").

Defendant further argues that, because plaintiff acknowledges that the nonmanual work test is met, and also that his work is "intellectual and varied," the discretion and independent judgment test is met. The OPM regulations do not state that satisfaction of the nonmanual work test means that there is no further need to independently consider the discretion and independent judgment test. If one test were automatically satisfied whenever another test was satisfied, then there would have been no need for the two different tests. OPM regulations, in fact, require satisfaction of all of the tests for

the administrative exemption. *See* 5 C.F.R. § 551.206.

Defendant points to the parties' stipulation that "Import Specialists classify commercially imported articles or products into the most appropriate of about 20,000 separate, but often very similar, items enumerated under the Harmonized Tariff System." The parties also stipulated that Import Specialists such as Mr. Grandits "appraise[d] the statutory unit value of the imported merchandise and determine the applicable rate of customs duty and internal revenue tax." As a GS–12 Import Specialist, Mr. Grandits reviewed the paperwork filed by the importer, may have physically examined samples of the imported article, or might have applied laboratory product analyses, and identified features or product uses that drive tariff classification, value and duty. Defendant emphasizes the "ever-changing set of facts (*i.e.* types of imported goods)," which Mr. Grandits was required to evaluate.

The Harmonized Tariff Schedule is a highly specific document, with 97 chapters grouped into 21 sections, and, according to the parties, about 20,000 separate tariff classification categories.[8] In his GS–12 role, as well as his GS–13 role, Mr. Grandits was the leader of a two-person team assigned to work with industrial equipment, including heavy machinery and machines used to produce other goods. He has worked with this line of products for at least the last fifteen years. The Harmonized Tariff Schedule specifies the rates of duty for imported products. The "Article Description" of the Tariff Schedule provides great specificity in distinguishing the various types of articles. The category in which the article is placed determines the rate of duty and import restrictions, which also are specified in the Tariff Schedule.

---

7.  OPM regulations also define "hours of work" as "all time spent by an employee performing an activity for the benefit of an agency ...." 5 C.F.R. § 551.104. The OPM regulations continue: "*Worktime,* for the purpose of determining FLSA exemption status, means time spent actually performing work." *Id.* (emphasis in original).

8.  By way of background, the parties have stipulated for the record that:

    Import Specialists perform their duty assessment and trade-related functions within a

framework of law and regulations which includes the Harmonized Tariff System and the legal definitions of value for customs purposes collectively known as the value law. Over the years, the Tariff Act has been amended by Congress through ratification of a series of bilateral and multilateral trade agreements negotiated between the United States and other nations and through enactment of legislation based on foreign policy and economic considerations.

Once an imported product is classified into a tariff category, the rate of duty computation still could involve additional reasoning, depending on the applicability of a special tariff treatment program, such as the Generalized System of Preferences (coded A, A* or A+ in the Tariff Schedule), the Automotive Products Trade Act (coded B), or the North American Free Trade Agreement (coded CA for Canadian goods and MX for Mexican goods). The rate of duty and any special tariff programs, such as NAFTA, are specified, detailed and mandatory. Import Specialists such as Mr. Grandits do not make the tariff policy reflected in the Tariff Schedule, but implement it. Knowledge and skill, acquired over time, will assist the Import Specialist to accurately review the categorization of imported goods submitted with the imports by the importer, but the discretionary tariff policy decisions made by others and reflected in the detail of the Tariff Schedule have the effect of largely removing discretion from the Import Specialists implementing the Tariff Schedule. Moreover, because the imports arrive with paperwork indicating the proposed categorization, the review process does not normally require perusal of the entire tariff schedule applicable to heavy machinery and machines used to produce other goods to find the proper category for tariff application. At oral argument on the cross-motions for summary judgment, even defendant's counsel acknowledged that Mr. Grandits applies the Tariff Schedule, and ensures compliance with the Tariff Schedule.

Mr. Grandits, for example, works primarily in the area of industrial or production equipment, including heavy machinery and machines used to produce goods. These imports fall under the Harmonized Tariff Schedule in Section XVI, Chapter 84 (machinery and mechanical appliances) and Chapter 85 (electrical machinery and equipment). In a declaration filed February 16, 2005, Mr. Grandits explained that, to classify an "industrial robot" for import into the United States for purposes of determining the duty assessment and any import restrictions, for example, an Import Specialist would look to Chapter 85, Heading 8515 (electric, laser, ultrasonic, electron beam, magnetic pulse or plasm arc soldering or welding machines), for the proper classification. Tariff subheadings include the following:

Brazing or soldering machines and
 apparatus:
8515.11    Soldering irons and guns
8515.19    Other
Machines and apparatus for resistance
 welding of metal:
8515.21    Fully or partly automatic
8515.29    Other
Machines and apparatus for arc (including
 plasma arc) welding of metals:
8515.31    Fully or partly automatic
8515.39    Other
                  Non-rotating type:
                     AC transformer type
                     Other
                  Rotating type
8515.80    Other machines and apparatus
                  Ultrasonic welding machines
                  Other

Harmonized Tariff Schedule of the United States, United States International Trade Commission (USITC) Publication 3653 (2004), Heading 8515, at 85–21.[9] Depending on the category in which the industrial robot import is placed, the duty varies, as reflected in the Tariff Schedule.

In a declaration submitted for the record, Mr. Grandits stated that:

8. Because categorizing imports into the HTS headings and subheadings that I am assigned lies at the heart of, and closely interrelates with, each of the duties that I have performed as a Grade 12 and 13 Import Specialist, as explained in paragraph 4 above, almost all of the activities I perform in a typical workweek involve or flow directly from the categorization of imports into the appropriate headings. Ultimately, all of my work has depended on first determining the nature and classification of the imports that I am assigned.

Mr. Grandits' deposition also was submitted in support of the parties' joint stipulation of facts, and was relied on by both parties. In his deposition, Mr. Grandits states:

9. The parties submitted to the court a joint submission with the following statement: "The parties have stipulated to the facts contained in the declaration [submitted by Mr. Grandits] and the admissibility of the copy of the tariff schedule."

The people in the office who are doing the operational work, and we are the implementers of Customs policy, the verifiers, the field agents of U.S. Customs so to speak in regards to trade, do we reflect the priorities, the high profile priorities of this agency? Yes, by all means. Our work is directly related to the priorities the agency articulates at the highest level and subsequently communicates that to the port levels, where the port management articulates them to us, the field officers.

The record reflects that Mr. Grandits implements tariff policy. Mr. Grandits is experienced, with recognized expertise as an Import Specialist. Department of Labor (DOL) regulations distinguish skill, knowledge and experience from the critical factors of discretion and independent judgment.[10] In this regard, DOL regulations provide that:

(1) Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or *whether an object falls into one or another of a number of definite grades, classes, or other categories,* with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2 [the administrative exemption from the FLSA]. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

29 C.F.R. § 541.207(c)(1) (Jul. 1, 2004) (emphasis added).[11] The distinction made above in the DOL regulations resonates for the present case. Knowledge and skill in classifying imported products into tariff categories for purposes of computing duty rates do not demonstrate discretion and independent judgment. *See, e.g., Schaefer v. Indiana Michigan Power Co.,* 358 F.3d 394, 404 (6th Cir.2004) (in a private sector case involving the administrative exemption and a shipping specialist in a heavily regulated nuclear energy plant, the appellate court stated that: "The fact that the industry is heavily regulated may indeed mean that a facility like Cook [Nuclear Plant] may employ fewer individu-

---

10. *See Adam v. United States,* 26 Cl.Ct. at 786 ("[T]he DOL regulations can be used to shed light on the [FLSA]. Other than the statute itself, the OPM regulations are obviously the first point of reference that federal employers must use in implementing the FLSA. But in construing those regulations, the court is not barred, but rather is encouraged to consider the DOL's regulations and other interpretations of the [FLSA]. Although the OPM regulations are presumptively controlling, both sets of regulations are of value to the court.... [W]e believe the Labor Department materials provide guidance helpful to our construction of not only the FLSA, but also the OPM regulations."); *see also Billings v. United States,* 322 F.3d at 1333 ("[OPM] will administer the provisions of the [Fair Labor Standards Act] in such a manner as to assure consistency with the meaning, scope, and application established by the rulings, regulations, interpretations, and opinions of the Secretary of Labor which are applicable in other sectors of the economy.") (quoting Fair Labor Standards Amendments of 1974, H..Rep. No. 93–913, 93rd Cong., 2d Sess., at 28, *reprinted in* 1974 U.S.C.C.A.N. 2811, 2837) (alterations in original); *Zumerling v. Devine,* 769 F.2d at 750 (OPM's guidelines must "harmonize with the statute's 'origin and purpose,' ... as well as with the Secretary of Labor's regulations.") (quoting *United States v. Vogel Fertilizer*

Co., 455 U.S. 16, 26, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982)); *Aarnold v. United States,* 39 Fed.Cl. at 739 n. 4 ("OPM's regulations and interpretations must be consistent with the FLSA itself and with the standards set by DOL for the private sector. *See Lanehart v. Horner,* 818 F.2d 1574, 1578 (Fed.Cir.1987). While OPM regulations are controlling and are entitled to great deference, *see Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 798, 13 L.Ed.2d 616 (1965), the court also can consider DOL's regulations. *See American Fed'n of Gov't Employees v. OPM,* 821 F.2d 761, 769–71 (D.C.Cir.1987).").

11. The language of the DOL regulations is consistent with the language of the OPM regulations, which state:

(1) The work must be sufficiently complex and varied so as to customarily and regularly require discretion and independent judgment in determining the approaches and techniques to be used, and in evaluating results. This precludes exempting an employee who performs work primarily requiring skill in applying standardized techniques or knowledge of established procedures, precedents, or other guidelines which specifically govern the employee's action.

5 C.F.R. § 551.104 (part of the definition of discretion and independent judgment).

als who actually exercise discretion. Cook employs a different type of employee—those who can follow regulations—than it would have to employ in the absence of the regulation—that is, those who could make the kinds of decisions made by those who write the various regulations. The very purpose of such detailed regulations and procedures is to create conformity which has the practical effect of minimizing discretion."); *McComb v. New York & New Brunswick Auto Express Co.,* 95 F.Supp. 636, 642 (D.N.J.1950) (in a private sector case involving the classification of shipments and the computation of rates pursuant to tariff schedules, the court held that: "The essence of his work required him to exercise no substantial discretion but simply, efficiently and accurately to ferret out of the information provided for him in the way of source data that formed the basis for the charges.... This required a considerable degree of skill and proficiency but does not fall into the sphere of administrative capacity which takes him out of the purview of the Fair Labor Standards Act.").

Defendant further argues that Mr. Grandits exhibits the requisite discretion and independent judgment because "he is responsible for designing initiatives to inspect classes of imports." Defendant appears to be referring to the possibility that importers may have misclassified imports by using a catch-all classification category in the Tariff Schedule. As a Grade 12 Import Specialist, Mr. Grandits raised the issues with team members, telling them what to look for, to ensure that imports were not misclassified. The parties concede that Mr. Grandits is able and capable of identifying the potential for misclassification in his specialty area of industrial equipment. What defendant describes as "designing initiatives," however, appears to be no more (and no less) than an experienced, knowledgeable Import Specialist attempting to do a good job within the context of a highly regulated area. The initiatives highlighted and relied on by defendant to demonstrate discretion and independent judgment do not in fact stray from compliance with the comprehensive, detailed Tariff Schedule and other Customs laws, regulations programs, policies and procedures.

The parties have consulted, and stipulated that Mr. Grandits' daily duties

include spending about 40% of his time reviewing entries for discrepancies and anomalies and identifying priorities and designing strategies to prioritize the review of entries according to Customs' policies and procedures. The rest of his time is divided approximately equally among the other tasks of his grade level such as handling protests, serving as commodity expert, informing members of the public about regulatory requirements; managing port accounts; and conducting verifications of imported goods claiming NAFTA consideration. All of Mr. Grandits' work is subject to the final review of the Supervisory Import Specialist.

Mr. Grandits' work as a GS–12, therefore, was informed by, constrained and devoted to compliance with Customs' policies and procedures, such as the comprehensive and detailed Tariff Schedule. Plaintiff properly points out that tariff classification and assessment of duties and related work also is performed by virtually all Import Specialists, including those at Grades 5 through 11, which are grades that Customs has classified as FLSA nonexempt. In this regard, in a jointly filed declaration dated February 16, 2005, Mr. Grandits stated, with the concurrence of the defendant, that:

6. Import Specialists at all grade levels classify imports under the HTS. On occasion, more junior Import Specialists will discuss or refer more complex classification problems to higher-graded Import Specialists, who have greater knowledge and expertise in a particular line of imports.

See *Adam v. United States,* 26 Cl.Ct. at 787 ("[D]efendant has pointed to no significant difference between the day-to-day activities of GS–9s and GS–11s that would warrant a finding that senior agents' work is different in this respect."); *Adams v. Dep't of Juvenile Justice of the City of New York,* 143 F.3d 61, 66 (2nd Cir.1998) ("We see no reason to upset the district court's ruling that Senior Houseparents [working in city detention facilities for juveniles] performed essentially the same work as Houseparents and there-

fore affirm its determination that Senior Houseparents do not fall under the 'executive, administrative, or professional capacity' exemption."); *United States Dep't of the Navy Naval Explosive Ordinance Disposal Tech. Div. Indian Head, Maryland and Am. Fed. of Gov't Employees, Local 1923*, 56 F.L.R.A. 280, 2000 WL 505480, at *3, *8–9 (2000) (approving an arbitrator's conclusion, the Federal Labor Relations Authority (FLRA) wrote that: "If the set of duties, knowledge required, and supervisory controls are either the same or essentially the same, then the positions must all carry the same classification for FLSA overtime. Since the parties have already determined that the similar positions are non-exempt, then these ... positions must also be non-exempt.") (omission in original).

The distinction between the Grade 12 position, previously held by Mr. Grandits, and the grades 5—11 which Customs itself has defined as FLSA nonexempt, is the experience, knowledge and skill of the Grade 12 Import Specialist, epitomized by Mr. Grandits. The comprehensiveness and detail of the Tariff Schedule places a premium upon the implementation abilities of Mr. Grandits, rather than the qualities of discretion and independent judgment. Defendant has not carried its burden to demonstrate that as a GS–12 Mr. Grandits exercised the requisite discretion and independent judgment. The failure of the government to meet the discretion and independent judgment test is fatal to defendant's claim of administrative exemption, however, because Mr. Grandits is a representative plaintiff, and in the interest of compiling a complete record, the court will proceed to review the government's arguments on the primary duty test.

### 3. *Primary Duty Test*

OPM regulations set forth the test with which defendant must comply to support an administrative exemption:

> (a) *Primary duty* [12] *test.* The primary duty test is met if the employee's work–
> (1) Significantly affects the formulation or execution of management programs and policies; or
> (2) Involves management or general business functions or supporting services of substantial importance to the organization serviced; or
> (3) Involves substantial participation in the executive or administrative functions of a management official. [13]

5 C.F.R. § 551.206(a). Defendant argues that in addition to the traditional functions—assessing customs duties and taxes, and assuring compliance with Customs laws and regulations-Import Specialists also engage in trade-related functions which meet the primary duty test. Defendant argues that Mr. Grandits requests financial audits and criminal investigations by other agencies when fraud is suspected, designs initiatives to ascertain whether importers are misclassifying their products for tariff purposes, obtains compliance with Customs' policies, deals with the importing public, drafts explanations for his decisions, and has become the local ex-

---

**12.** OPM regulations state that:
> *Primary duty* typically means the duty that constitutes the major part (over 50 percent) of an employee's work. A duty constituting less than 50 percent of the work may be credited as the primary duty for exemption purposes provided that duty-
> (1) Constitutes a substantial, regular part of a position;
> (2) Governs the classification and qualification requirements of the position; and
> (3) Is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made.
>
> 5 C.F.R. § 551.104 (emphasis in original).

**13.** OPM regulations state that:

> *Participation in the executive or administrative functions of a management official* means the participation of employees, variously identified as secretaries, administrative or executive assistants, aides, etc., in portions of the managerial or administrative functions of a supervisor whose scope of responsibility precludes personally attending to all aspects of the work. To support exemption, such employees must be delegated and exercise substantial authority to act for the supervisor in the absence of specific instructions or procedures, and take actions which *significantly affect the supervisor's* effectiveness.
>
> 5 C.F.R. § 551.104. Defendant has not argued that this third factor as defined serves to meet the primary duty test for Mr. Grandits, nor does the record support this factor.

pert on his assigned line of merchandise (industrial equipment). From this, defendant argues that Mr. Grandits was accomplishing the programs and policies of the Customs Service and the agency's broad national goals, and is affecting the execution of management programs or policies by obtaining compliance with the policies. Defendant argues that Mr. Grandits' duties as a GS–12, in the language of the OPM regulations, significantly affected the "execution of management programs or policies," 5 C.F.R. § 551.206(a)(1), and also involved "supporting services of substantial importance" to Customs, 5 C.F.R. § 551.206(a)(2). This is the very language of two parts of the primary duty test, and a demonstration by defendant of either section 551.206(a)(1) or section 551.206(a)(2) would satisfy the primary duty test, if accurate.

The critical terms are defined by the OPM regulations:

*Formulation or execution of management programs or policies* means work that involves management programs and policies which range from broad national goals expressed in statutes or Executive orders to specific objectives of a small field office. Employees make policy decisions or participate indirectly, through developing or recommending proposals that are acted on by others. Employees significantly affect the execution of management programs or policies typically when the work involves obtaining compliance with such policies by other individuals or organizations, within or outside of the Federal Government, or making significant determinations furthering the operation of programs and accomplishment of program objectives. Administrative employees engaged in such work typically perform one or more phases of program management (that is, planning, developing, promoting, coordinating, controlling, or evaluating operating programs of the employing organization or of other organizations subject to regulation or other controls).

5 C.F.R. § 551.104 (emphasis in original). The work of all Import Specialists, regardless of grade, could be said to involve "obtaining compliance" with Customs' schedules, regulations and policies. But not all Import Specialists also perform one or more of the phases of "program management" defined immediately above, such as "planning, developing, promoting, coordinating, controlling, or evaluating operating programs" for Customs. These "program management" functions distinguish the exempt administrative employee from the nonexempt employee performing production functions. Furthermore, OPM regulations explicitly distinguish the "management or general business function," from "production functions": *"Management or general business function . . .*, as distinguished from production functions, means the work of employees who provide support to line managers." 5 C.F.R. § 551.104.[14]

As noted above, defendant also argues that Mr. Grandits' work as a GS–12 involved "supporting services of substantial importance" to Customs. 5 C.F.R. § 551.206(a)(2). OPM regulations define the work of employees furnishing supporting services to management:

(i) Providing expert advice in specialized subject matter fields, such as that provided by management consultants or systems analysts;

(ii) Assuming facets of the overall management function, such as safety management, personnel management, or budgeting and financial management;

(iii) Representing management in such business functions as negotiating and administering contracts, determining acceptability of goods or services, or authorizing payments; or

(iv) Providing supporting services, such as automated data processing, communications, or procurement and distribution of supplies.

5 C.F.R. § 551.104. Just as "management or general business function" is distinguished from "production functions," the

**14.** Similarly, "Subpart B—Interpretations" of 29 C.F.R. Part 541, United States Department of Labor regulations, describe the phrase "directly related to management policies or general business operations," as "those types of activities relating to the administrative operations of a business as distinguished from 'production' . . . ." 29 C.F.R. § 541.205(a) (July 1, 2004).

above defined "supporting services of substantial importance" to management also are distinguished from "production functions" by explicit definitions in the OPM regulations: "[S]upporting service, as distinguished from production functions, means the work of employees who provide support to line managers." 5 C.F.R. § 551.104.

In addition, the preamble to the administrative exemption emphasizes the program management function, rather than the production function: "An *administrative employee* is an advisor or assistant to management, a representative of management, or a specialist in a management or general business function or supporting service ...." 5 C.F.R. § 551.206 (emphasis in original). Plaintiff disputes that Mr. Grandits meets this introductory definition of the administrative exemption, or any of the criteria for the primary duty test.

Based on the above citations to OPM regulations, plaintiff draws the distinction for the primary duty test of the administrative exemption on the difference between FLSA exempt management functions and nonexempt production functions entitled to FLSA overtime. Both the OPM regulations and case law support the distinction. *See Aamold v. United States*, 39 Fed.Cl. at 745–46 (in a federal employee FLSA overtime case involving National Security Agency Security Protective Officers, the court addressed a collection of cases on the administrative exemption and discussed the distinction between management functions and production functions, but concluded that, at that stage of the proceedings in *Aamold*, additional fact finding was required).

In *Adam v. United States*, 26 Cl.Ct. at 794, a federal employee FLSA overtime case involving Immigration and Naturalization Service Senior Border Patrol Agents, the court concluded that the FLSA administrative exemption did not apply, and granted the plaintiffs summary judgment motion on liability. The government had argued in the *Adam* case that the work of the Senior Border Patrol Agents involved obtaining compliance with INS policies by other individuals and organizations and that the agents' work, therefore, significantly affected the execution

of management policies and programs. *Id.* at 787. The court disagreed:

These [patrol duty] tasks do not involve obtaining compliance with INS policies, but rather are routine law enforcement duties involved in obtaining compliance with the nation's immigration laws. If by enforcing the nation's immigration laws the agents are "significantly affecting" the execution of policy, then all border patrol agents should be exempt, and not just the senior agents. But defendant has pointed to no significant difference between the day-to-day activities of GS–9s and GS–11s that would warrant a finding that senior agents' work is different in this respect.

The problem with defendant's interpretation of this provision is that it equates "significantly affecting the execution of policy" with the mere "execution of policy." ... Thus, employees covered by the administrative exemption perform management or staff functions and are not front-line production workers.... [Defendant] cites plaintiffs' role in ensuring that the nation's immigration laws are observed as proof that plaintiffs significantly affect the execution of the INS's policy against illegal immigration.

Perhaps defendant's misapplication of this criterion can be traced to the difference between the terms "affect" and "effect." Presumably, every employee "effects" the execution of policy by carrying it out. But it is only those positions that "significantly affect," i.e., influence or change, the execution of policy that are exempt. Those are the positions whose incumbents, according to OPM, plan, develop, promote, coordinate, and/or supervise others. Front-line production-type employees do not fit within this category. Neither do the plaintiffs....

Prosecuting violators of the immigration laws directly involves performance of an INS mission and thus is a line function of INS.... In the present case, the senior border patrol agents perform the end function itself.

*Adam v. United States*, 26 Cl.Ct. at 787–88, 790. Similarly, the duties of the Import Specialist are routine "enforcement" duties

involved in obtaining compliance with the nations's customs laws and regulations. Although the *Adam* case dealt with immigration patrol duties, there are similarities in what could be termed customs "patrol duties" performed by Import Specialists at issue in the present case. The INS is concerned with applying immigration laws and regulations to persons entering the United States; Customs is concerned with applying customs laws and regulations to products entering the United States. The Senior Border Patrol Agents in *Adam* and the Import Specialists in the present case are performing the immigration and customs missions of their respective agencies—the end functions.

The court in another case, *Adam v. United States*, found that: "the formulation and execution of management policy [5 C.F.R. § 551.206(a)(1)] is distinct from the generation of the agency's product or basic task." *Adams v. United States*, 27 Fed.Cl. 5, 14 (1992), *rev'd and remanded on other grounds* [to complete the record regarding the actual work performed], 178 F.3d 1306 (Fed.Cir. 1998); *see also Amshey v. United States*, 26 Cl.Ct. 582, 603 (1992) (the court acknowledged the difference between staff functions and production work, or the agency's internal management functions versus the production of a law enforcement agency), *order vacated* [based on a financial settlement in favor of plaintiffs], 35 Fed.Cl. 358 (1993); *see also Adam v. United States*, 26 Cl.Ct. at 789. The court in *Adams* also distinguished between supporting service work, 5 C.F.R. § 551.206(a)(2), and production work, citing *Campbell v. United States*, 755 F.Supp. 893, 896 (E.D.Cal.1990), *order vacated* [in favor of a settlement between the parties], 972 F.2d 1352 (Fed.Cir.1992) (table): "Thus, the *Campbell* court interpreted the phrase 'supporting service personnel' as meaning those employees who provide a service which permits the agency to pursue its basic task, while not directly engaging in that task, and who were thus exempt from FLSA overtime provisions." *Adams v. United States*, 27 Fed.Cl. at 15; *see also Statham v. United States*, No. 00–699C, 2002 WL 31292278, at *7–9 (Fed.Cl. Sept.11, 2002) (finding that executive protection work did not constitute a management supporting service, 5 C.F.R. § 551.206(a)(2), and was not FLSA exempt) (citing *Adam v. United States*, 26 Cl.Ct. at 789).

FLSA case law provides further examples of the distinction between staff functions and production work. *See, e.g., Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) (in a private sector case, the court discussed whether the claimant's primary duty was directly related to the administrative exemption's management policies or general business operations, and stated: "The administration/production distinction thus distinguishes between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself'" or determining its overall course or policies—not to carrying out day to day business affairs.) (footnote omitted) (quoting *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir.1990), *cert. denied*, 498 U.S. 1086, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991)); *Reich v. State of New York*, 3 F.3d 581, 587–88 (2nd Cir.1993) (describing how the primary function of investigators was to conduct, or "produce" criminal investigations, not to administer the affairs of the New York State Bureau of Criminal Investigation, thereby placing the employees on the "production" side rather than the administrative (exemption) side of the FLSA overtime issue), *cert. denied*, 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994); *Roney v. United States*, 790 F.Supp. 23, 27 (D.D.C.1992) (relying on an earlier Department of Labor ruling which stated that law enforcement and investigation activities are primary functions of a sheriff's office and a district attorney's office, such that sheriff office and district attorney office investigators are related more to ongoing, day to day operations than to management policies or general business operation, the court concluded that: "The service that the Marshals provide for the courts does not relate to security policy or operational management but rather to the application of security measures to the day-to-day production process of a working courtroom."); *Reich v. Am. Int'l Adjustment Co.* (AIAC), 902 F.Supp. 321, 325 (D.Conn.1994)

("AIAC is in the business of resolving damage claims. The appraisers perform the day-to-day activities of the business through their fact finding and damage evaluations. The appraisers do not administer the business of AIAC."); *Harris v. Dist. of Columbia*, 741 F.Supp. 254, 262 (D.D.C.1990) ("In this instance, [District of Columbia municipal] housing inspections, obviously, are the 'production' of the Housing Inspection Branch. Time that Supervisory Housing Inspectors spend inspecting residences is work spent in the 'production' of the unit. Under the regulations quoted, this amount of time spent in such production disqualifies plaintiffs from being administrative employees."); *Gusdonovich v. Bus. Info. Co.* (BIC), 705 F.Supp. 262, 265 (W.D.Penn.1985) (in concluding that the employee was not an FLSA exempt administrative employee, the court stated that: "BIC's business is 'producing' information for its clients, and the plaintiff's duties [as an Insurance Claim Investigator] consisted almost entirely of gathering that 'product.' Thus, it appears to the court that the plaintiff was engaged in 'production' within the meaning of the [Department of Labor] regulation."), *stay* [of execution of judgment] *denied*, 119 F.R.D. 15 (W.D.Pa.1987); *United States Dep't of Health & Human Servs. Soc. Sec. Admin. and Am. Fed'n of Gov't Employees*, 49 F.L.R.A. 483, 485–86, 1994 WL 77352 (1994) (rejecting the administrative exemption for Social Security Representatives and Claims Examiners because their work constituted the production work of the agency); *United States Dep't of the Treasury Internal Revenue Serv. and Nat'l Treasury Employees Union*, 46 F.L.R.A. 1063, 1066, 1074, 1992 WL 396127 (1992) (affirming the arbitrator's view that "a federal employee's 'primary duty' does not consist of work that 'significantly affects the ... execution of management policies or programs' within the meaning of [5 C.F.R. § 551.206(a)(1) ] if that employee is primarily performing line activities that carry out the mission and day-to-day functions of the agency, i.e., is primarily engaged in the 'production' work of the agency," and thereby rejecting the administrative exemption for Revenue Officers of the Internal Revenue Service); *United States Dep't of Health & Human Servs. Soc. Sec. Admin. and Am. Fed'n of Gov't Employees*, 44 F.L.R.A. 773, 795–96, 1992 WL 82821 (1992) (rejecting the administrative exemption for Social Security Claims Representatives and Claims Authorizers, and upholding the distinction between production work and staff work).

The parties have stipulated that Mr. Grandits' daily duties as a GS–12,

> include spending about 40% of his time reviewing entries for discrepancies and anomalies and identifying priorities and designing strategies to prioritize the review of entries according to Customs' policies and procedures. The rest of his time is divided approximately equally among the other tasks of his grade level such as handling protests, serving as commodity expert, informing members of the public about regulatory requirements; managing port accounts; and conducting verifications of imported goods claiming NAFTA consideration. All of Mr. Grandits' work is subject to the final review of the Supervisory Import Specialist.[15]

---

**15.** In support of their stipulation, the parties submitted Mr. Grandits' complete February 26, 2003, sworn deposition, during which he described the duties he performed over the course of a year, and the percentage of time associated with those duties, which is consistent with the parties' stipulation in the above text. Although apparently Mr. Grandits was describing his job duties for a year during which he was a GS–13, the duties were similar to those performed as a GS–12, a concept with which neither party appears to have taken issue. According to Mr. Grandits:

> I would say in the course of a year my major responsibilities would be, as I would see them, identifying priorities and designing strategies to meet the agency priority areas relative to tariff issues, tariff and trade compliance issues, as perhaps 40 percent of my time. That would include the research, the design, and the implementation.
>
> Another 10 to 15 percent of my time in regards to my work would be devoted, since I am on the northern border, to the issue of special trade programs exclusively, i.e., NAFTA in this case. And that would revolve around researching and identifying candidates for NAFTA verifications. That would include corresponding with these companies, receiving data from them, analyzing that data, on occasion traveling internationally, in this case to Canada, to these companies in order to per-

The above primary work boils down to Mr. Grandits ensuring that importers have properly classified their imports under the Tariff Schedule and products are properly classified, the proper tariff is charged and import restrictions observed. Defendant has not tied Mr. Grandits' primary work to exempt administrative staff functions, which requires that the work "[s]ignificantly affects the formulation or execution of management programs or policies," 5 C.F.R. § 551.206(a)(1), typically involving one or more phases of program management (planning, developing, promoting, coordinating, controlling, or evaluating operating programs), see 5 C.F.R. § 551.104. "[S]upporting services of substantial importance" to management or general business functions, 5 C.F.R. § 551.206(a)(2), typically involves providing expert advice such as that provided by management consultants or systems analysts, performing facets of the overall management function, representing management, or providing supporting services such as automated data processing, communications or procurement, see 5 C.F.R. § 551.104. Mr. Grandits' primary work is not in these administrative/management staff functions, but in line functions in direct support of the mission of Customs.

The parties have stipulated that the traditional mission of Customs is the collection of tariffs. The United States Customs Service was established in 1789 to collect tariffs on imported goods. For over one hundred years Customs was the exclusive source of funding for the nation. Today, Customs, along with the Border Patrol, portions of the Immigra-

tion and Naturalization Service, and the Animal and Plant Health Inspection Service have formed the Bureau of Customs and Border Protection, with a broader mission. However, assessing and collecting duties, excise taxes, fees and penalties on imported products remains a significant source of funds for the nation, and remains a major part of the mission of Customs, and clearly the part of Customs' mission signed to Mr. Grandits. At oral argument on the parties' cross-motions for summary judgment, defendant acknowledged the collection of tariffs mission of Customs. Mr. Grandits' primary work of ensuring that imported products are properly classified, tariffs are properly computed and import restrictions applied represents the production function at Customs. Defendant has not demonstrated that Mr. Grandits' work meets the primary duty test, or falls within the administrative exemption. Plaintiff correctly points out that: "Although Mr. Grandits' work as a GS–12 Import Specialist may have been highly specialized and crucial to the success of the duty collection *mission* of the Buffalo–Niagara Falls port-of-entry, it was not crucial to the successful *management* of the port." (emphasis in original).

The parties also have stipulated that Mr. Grandits was a Grade 12 "Team Leader," the leader of a two-person team assigned to work with his specialty of industrial equipment. Defendant argues that the position description of the GS–1889–12 Team Leader Import Specialist, in comparison with the position description of the GS–1889–11 Import Spe-

form verifications and to issue determinations relative to their NAFTA claim.

I would say another 15 percent of my time is devoted to informed compliance issues. That's informing members of the importing public relative to the regulatory requirements of the United States with regards to the importation of their goods.

Since this past year I have developed initiatives relative to national security issues, reviewing entries in the hopes of identifying any anomalies that could represent potential leads for our office of investigations. I would say over the last year we have devoted about 10 percent of the teams's time and resources to that effort.

Fifteen percent of the time would be involved with account management—not 15 per-

cent exclusively to accounts management. It would include account management, which is managing on a national basis accounts that I have. That would also include compliance measurement, which is one of the high priority areas. All of these are high priority areas. Within that 15 percent you would include compliance measurement which is to ensure the compliance based on statistically valid samples to determine compliance rates for certain industries.

And the rest would fall into sundry, such as other sundry, such as training within the team. There would be included in that 15 percent of time other protests, things of that nature and other miscellaneous.

cialist, demonstrates why the former should be FLSA exempt:

> While we concede that there are certain similarities between the work of the GS–11 and GS–12 positions, there are also significant differences: where the GS–11 "performs," the GS–12 "plans, conducts, and controls"; where the GS–11 "scrutinizes," the GS–12 "establishes procedures"; where the GS–12 "reviews," the GS–12 "establishes criteria" and "assures." Accordingly, where the GS–11 is covered by the provisions of the FLSA, the GS–12 is exempt.

The word differences quoted above, however, while perhaps useful in justifying the higher grade, do not necessarily justify the conclusion that Mr. Grandits' primary duty involves the execution of management programs or policies, or supporting services of substantial importance to management. Furthermore, although the position description is of interest, it is the actual, day to day work performed by Mr. Grandits, stipulated by the parties and described above, which is controlling.

Defendant argues that the Team Leader "can impact the way that Customs and Border Protection responds to particular importations and can alter how commodities enter the United States." Defendant cites to the March 7, 2003, deposition testimony of Arthur J. Lipp, a Supervisory Import Specialist in the Port of Buffalo. Mr. Lipp's complete deposition was submitted by the parties in support of their joint stipulation of facts. Mr. Lipp was asked for an example of an issue that a Team Leader might bring to his attention. In response, Mr. Lipp discussed the example of "garlic":

> Q. [by plaintiff's counsel] Give us an example of an issue that a team leader might bring to your attention.
>
> A. [by Mr. Lipp] Oh, gosh. Let's talk about garlic. The team leader that handled food was doing some reviews of their printouts. They noticed—they had some information about some Chinese garlic, but the suspicion was that this stuff was now routing from some other port and now it is coming through Canada into Buffalo, and they are probing these electronic systems and looking, and, lo and behold, they find some shipments of garlic coming through the port.
>
> Garlic was not a high priority. All of a sudden this becomes an issue and we try to grapple with how they are going to handle it. I asked them, what are you guys going to do? So they managed to get some electronic messages into the system to try and sample it. They succeeded in that. They get those samples routed to the office. They look at this and garlic is garlic. You look at it—nobody can tell the difference between Chinese garlic and other garlic, so they send it off to the lab and they get a lab analysis.
>
> Let me just stop. One of the intermediate steps before they even do that, they consult with our Customs lab and say, guys, can you help us and the lab people indicated that, yes, send the samples to us, we should be able to give you some information that might help you. And it comes back and they were able to—I will use the technical term—fingerprint the garlic and determine within a 99 percent degree of certainty that this alleged Canadian importation is really Chinese.
>
> Q. Why does the U.S. Customs Service care whether the garlic is from China or Canada?
>
> A. There is a 327 percent ad valorem duty on Chinese garlic. It is what we call ADCVD, anti-dumping countervailing duty, 327 percent. So the economic interest is that if you can avoid paying that. Canada has a very low rate, if nonexistent rate, of duty on garlic. Right now we are looking at millions of dollars in additional duty that would not be deposited in the Treasury if this is permitted to continue on. We are developing, based on what the import specialist did, we are developing a case right now.
>
> Q. When your team leader came to you with the Chinese garlic situation–
>
> A. Right.
>
> Q. did he or she need to get your approval for implementing a strategy to monitor this situation?

A. Absolutely not. The strategy, only in the sense that, hey, you got to be aware of this. We have got this situation going on, and you know I might need, if I run into a roadblock someplace, can you help me. But that was a self-initiated program.

This garlic example reflects that, in order to properly classify imports (Chinese garlic or other garlic) and to compute duties (327 percent duty on Chinese garlic), Team Leaders must possess knowledge and skill. But so must all Import Specialists, at all grades. As Import Specialists gain experience, skill and knowledge, they may be eligible for higher grades, but the primary duty of Import Specialists, which is a line duty, remains unchanged.

As a Team Leader, Mr. Grandits possesses specialized knowledge and expertise in his assigned product line, industrial equipment. Also as a Team Leader, Mr. Grandits prioritizes the work of his team. These Team Leader functions, however, do not bridge defendant's requirement to tie Mr. Grandits to the program management function or to a supporting service of substantial importance to the management function. The Team Leader status does not reflect that "management" was Mr. Grandits' primary duty. Nor has defendant invoked the "executive" exemption, which involves the supervision or management of an agency or subdivision of an agency, a function in which Mr. Grandits was not involved as a GS–12. 5 C.F.R. § 551.205 (Jan. 1, 2005). The parties have stipulated that Mr. Grandits did not have any personnel, staffing or budgeting authority; does not approve leave or overtime requests; lacked the authority to discipline employees; could not re-allocate personnel resources in response to workload; and did not issue performance appraisals. Mr. Grandits' Team Leader status, by itself, does not invoke the administrative exemption. *See e.g., Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 692 (6th Cir.2001) ("Although shift supervisors did spend some of their time supervising employees, this supervision was not managerial in nature because they had no control over the people they supervised."), *reh'g and suggestion for reh'g en banc denied* (2002); *Donovan v. United Video, Inc.*, 725 F.2d 577,

582 n. 5 (10th Cir.1984) (three FLSA nonexempt engineers performed some supervisory duties in addition to their regular duties: "The district court found, however, that these additional supervisory duties are not substantial enough to warrant different treatment for exemption purposes. We agree. The record shows that two of the three engineers ... supervise only one employee each, and spend only nominal amounts of their work week in supervisory work. The third engineer ... stated that he spends on the average ten hours per work week supervising four employees. However, his testimony makes clear that his supervisory work involves more coordination than direct supervision, and is in addition to the operational responsibilities common to all microwave engineers.") (citations omitted); *Barth v. Wolf Creek Nuclear Operating Corp.*, 125 F.Supp.2d 437, 440 (D.Kan.2000) ("Plaintiffs testify that they prioritize work orders relating to their systems, manage system performance, perform trending duties, prepare certain reports, and do multiple other tasks, yet the record fails to reveal that such duties, though important to the defendant's production of nuclear energy, are clearly and primarily administrative in nature.").

Defendant argues that the *Donovan* and *Barth* cases are "not persuasive," without further elaboration. The court disagrees. Defendant cites instead the cases of *Jastremski v. Safeco Ins. Cos.*, 243 F.Supp.2d 743 (N.D.Ohio 2003) and *Palacio v. Progressive Ins. Co.*, 244 F.Supp.2d 1040 (C.D.Cal.2002). Both of these private sector, Department of Labor cases are distinguishable on the facts from the present case. Mr. Jastremski was a Senior Claims Representative and Ms. Palacio was a Claims Agent. Both opinions cited to the language of the Department of Labor regulations, which state that:

The test of "directly related to management policies or general business operations" is also met by many persons employed as advisory specialists and consultants of various kinds, credit managers, safety directors, *claim agents and adjusters*, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in

stock exchange firms, promotion men, and many others.

29 C.F.R. § 541.205(c)(5) (emphasis added); *see Jastremski v. Safeco Ins. Cos.,* 243 F.Supp.2d at 751; *Palacio v. Progressive Ins. Co.,* 244 F.Supp.2d at 1045, 1046. In addition to this explicit language in the Department of Labor regulations tying claim agents and adjusters to management policies or general business operations, both cases emphasized that the employees advised management throughout the claims adjustment process, determined insurance coverage, weighed evidence, assessed liability, negotiated with claimants, consulted with company counsel, made recommendations to management, and represented the company. *Jastremski v. Safeco Ins. Cos.,* 243 F.Supp.2d at 752; *Palacio v. Progressive Ins. Co.,* 244 F.Supp.2d at 1045–47. With respect to the production/staff analysis, both opinions declined to place the claimants in production, due to the nature of the business mission. *See Palacio v. Progressive Ins. Co.,* 244 F.Supp.2d at 1047 ("Progressive is not in the business of claims handling. Rather, it is in the business of writing and selling automobile insurance. Claims handling occurs within a functional department as a type of ancillary customer service.... As a claims representative, Palacio did not produce the very goods or services that Progressive offered to the public.") (citations omitted); *Jastremski v. Safeco Ins. Cos.,* 243 F.Supp.2d at 753 (distinguishing *Bell v. Farmers Ins. Exchange,* 87 Cal.App.4th 805, 105 Cal.Rptr.2d 59, 74, *cert. denied,* 534 U.S. 1041, 122 S.Ct. 616, 151 L.Ed.2d 539 (2001), a case in which claims adjusters were found to be nonexempt: "The facts of *Bell,* however, were quite different [from the facts in *Jastremski*], because claims adjusting was 'the sole mission' of the defendant company [*Bell*], which was one of several affiliated insurance companies. The defendant in *Bell,* therefore, produced nothing but settled claims; its adjusters were production workers."). Given the primacy of tariff classification, computation of duties and the vindication of import restrictions at Customs, Mr. Grandits' primary work as a GS–12 in support of that mission places him in the category of a nonexempt production worker.[16] Defendant has not carried its burden to demonstrate that Mr. Grandits' Grade 12 work met the primary duty test for the administrative exemption. Failure to meet the primary duty test alone defeats the administrative exemption for Mr. Grandits' Grade 12 work.

**B. *GS–13 Import Specialist—Administrative Exemption***

■ Defendant also argues that Mr. Grandits' Grade 13 work is exempt administratively.

**1. *Nonmanual Work Test***

The court concluded earlier that Mr. Grandits met the criteria for the nonmanual work test, because he performs predominantly nonmanual work. This conclusion holds true for both the work Mr. Grandits performed at Grade 12 and at Grade 13. Plaintiff acknowledges that Mr. Grandits meets the nonmanual work test for both grade levels, but disputes the other tests required for an administrative exemption: the discretion and independent judgment test and the primary duty test.

16. Defendant also argues that the "production versus staff" analysis is not applicable to the present case because of the small number of GS–12 Team Leader Import Specialists and GS–13 Field National Import Specialist positions. The parties have stipulated that Customs employs 963 non-supervisory Import Specialists, with 186 at the GS–12 level and 131 at the GS–13 level. Mr. Grandits is one of approximately thirty Import Specialists working at the Buffalo–Niagara Falls port-of-entry. These Import Specialists are divided into teams with two to four members, which specialize in particular lines of products. Defendant does not cite any authority for the proposition that the production versus staff analysis should be abandoned when smaller numbers of employees are involved, and cites no authority to demonstrate that the above numbers are sufficiently small to invoke the policy. To the contrary, OPM regulations and case law, cited above, support the production versus staff analysis. Furthermore, even a single employee performing production duties on a day to day basis, instead of program management/staff duties, should not fall within the administrative exemption. Nevertheless, the Import Specialist numbers cited above are large enough to reflect the tariff classification and computation production work performed by Mr. Grandits and the other Import Specialists.

### 2. Discretion and Independent Judgment Test

The difference between Grade 12 and Grade 13 Import Specialists is that the Grade 13 position is known as the Field National Import Specialist (FNIS). The FNIS is authorized to issue binding rulings and pre-classification rulings on prospective imports. The parties have stipulated, however, that Mr. Grandits is rarely called upon for these duties. Issuing binding rulings and pre-classification rulings are not a substantial part of Mr. Grandits' work, and not part of his "normal day-to-day work." *See* 5 C.F.R. § 551.206(c) ("The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work."). Furthermore, binding rulings and pre-classification rulings involve the "standard" duties of examining an import, determining if it was properly classified by the importer and that the appropriate duties, fees and taxes were identified to be paid. These standard duties were considered earlier, and found to benefit from knowledge and skill, but not to require the requisite level of discretion and independent judgment for exemption.

Defendant combined the work Mr. Grandits performed as a Grade 12 and Grade 13 Import Specialist for purposes of arguing that he met the discretion and independent judgment test for the administrative exemption. Defendant has not demonstrated the requisite discretion and independent judgment for either grade, for the same reasons described above. Because Mr. Grandits, as well as other nonexempt Import Specialists in lower grades, utilize comprehensive, detailed and established Customs laws, regulations, procedures and schedules, requiring classification into categories for purposes of computing tariff rates, they are not charged with sufficient discretion throughout the process to render the work nonexempt. *See* 29 C.F.R. § 541.207(c)(1) ("An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2 [the administrative exemption from the FLSA]."); 5 C.F.R. § 551.104 (defining discretion and independent judgment); *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d at 404 (the heavily regulated nuclear energy plant employed personnel who can follow regulations: "The very purpose of such detailed regulations and procedures is to create conformity which has the practical effect of minimizing discretion."). Although additional experience, skill and knowledge may distinguish Mr. Grandits' Grade 13 work from that performed at lower grades, the rates of duty and special tariff programs are specified, detailed and mandatory, requiring knowledge and skill in the application of Customs statutes, regulations and schedules, but leaving little room for the level of discretion and independent judgment necessary for exemption.

### 3. Primary Duty Test

As noted above, among the differences between Grade 12 and Grade 13 Import Specialists is that the Grade 13 position is authorized to issue binding rulings and pre-classification rulings on prospective importations. The parties have stipulated, however, that Mr. Grandits is rarely called upon for these duties. Issuing binding rulings and pre-classification rulings is not a substantial part of Mr. Grandits' work, and does not constitute his primary duty. To be considered "primary duty," OPM regulations specify that the duty constitute the major part of an employee's work (50 percent or more). 5 C.F.R. § 551.104.[17] Fur-

---

17. Defendant makes an argument in support of the "professional" exemption, considered below, which could be applied to the primary duty test of the administrative exemption for the GS–13 Field National Import Specialist (FNIS). Defendant argues that, though binding rulings and pre-classification rulings do not constitute over 50 percent of Mr. Grandits' work, the alternate definition of primary duty applies. In this regard, OPM regulations provide that a duty constituting less than 50 percent of the work may still be deemed the primary duty, so long as the duty:

(1) Constitutes a substantial, regular part of a position;

thermore, binding rulings and pre-classification rulings involve the standard duties of examining an import, determining how it should be classified, and assessing appropriate duties, fees and taxes. These functions do not differ from the production work discussed above and determined to be nonexempt. Reviewing importers' classification and computing duties pursuant to the Tariff Schedule is front-line, production work—end functions—in performance of the mission of Customs, and not exempt management/administrative work. Mr. Grandits' primary work is important to the duty collection mission of the Buffalo–Niagara Falls port-of-entry, and Customs, but is not part of the successful management of the port.

In its initial brief, defendant also argues that the GS–13 position description states: "Serves as a *national consultant* within the Customs Service on tariff classification, value, and other import-related issues pertaining to a highly specialized commodity area comprising a relatively narrow segment of the Tariff Schedules of the United States [Annotated] (TSUSA) ...." (emphasis in original). Defendant further notes that the GS–13 position description states: "Position is responsible for *development, implementation, coordination, evaluation,* monitoring and *ensuring compliance* with procedures, policies, and regulations pertaining to the entry, admissibility, and appraisement of merchandise imported to the United States." (emphasis in original). Defendant does not take the next step, and attempt to tie these excerpts from the position description to the administrative exemption, but only argues

(2) Governs the classification and qualification requirements of the position; and
(3) Is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made.
5 C.F.R. § 551.104. Defendant notes that plaintiff's opposition brief states that the authority to issue binding rulings and pre-classification rulings "determines their [GS–13] grade level." Defendant argues that the second part of the above test ("governs the classification of the position") is, therefore, met. However, even if true, all parts of the above, three-part alternate primary duty test must be met. The parties have stipulated that binding rulings and pre-classification rulings are rarely issued. The court con-

generally that they support exemption from the FLSA. The definition of "management or general business function or supporting service" states that employees furnish such support by "(i) [p]roviding expert advice in specialized subject matter fields, such as that provided by management consultants or systems analysts ...." 5 C.F.R. § 551.104. If the described duties actually represented Mr. Grandits' primary duties, then the issue would be whether the criteria of the primary duty test was met. The court does not reach this issue because the record reflects that the above described activities, drawn from the Grade 13 position description, are not Mr. Grandits' primary duties. Mr. Grandits, in deposition testimony submitted to the court by the parties, has described his primary duties, and the parties also have stipulated to his primary duties. The court finds that, although the above described duties are found in the GS–13 position description, they do not represent Mr. Grandits' actual, day to day work at Customs, and do not reflect his primary duties. The court finds that Mr. Grandits' primary duties are not in the nature of or at the level of a "management consultant" or "systems analyst," but are more analogous to those of nonexempt Grade 11 Import Specialists.

## II. *Professional Exemption*

■ Defendant also argues that Mr. Grandits, as a GS–13 Field National Import Specialist, is exempt under the professional exemption. A "professional employee" is defined in the OPM regulations as one who meets all of the following criteria: [18]

cludes that such duties do not constitute a substantial, regular part of Mr. Grandits' work, as required by the alternate primary duty test. Furthermore, such work is by its nature "production" work—classifying and computing tariffs—and not involved with port management. Such work is not, therefore, in compliance with the third part of the alternate primary duty test, and does not constitute Mr. Grandits' primary duty.

18. As with the administrative exemption, a fourth test, called the "80–percent test," provides that employees must spend at least 80 percent of a representative work week on professional functions. 5 C.F.R. § 551.207(d). The 80–percent test, however, by its language applies only to the GS–5 and GS–6 grades and, therefore, is not applicable to the present case.

**544**

(a) *Primary duty test.* The primary duty test is met if the employee's work consists of–

(1) Work that requires knowledge in a field of science or learning customarily and characteristically acquired through education or training that meets the requirements for a bachelor's or higher degree, with major study in or pertinent to the specialized field as distinguished from general education; or is performing work, comparable to that performed by professional employees, on the basis of specialized education or training and experience which has provided both theoretical and practical knowledge of the specialty, including knowledge of related disciplines and of new developments in the field; . . . . [19]

(b) *Intellectual and varied work test.* The employee's work is predominantly intellectual and varied in nature, requiring creative, analytical, evaluative, or interpretative thought processes for satisfactory performance.

(c) *Discretion and independent judgment test.* The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

5 C.F.R. § 551.207 (Jan. 1, 2005) (emphasis in original).[20]

## A. GS–13 Import Specialist—Professional Exemption

### 1. Intellectual and Varied Work Test

Defendant argues that this test is essentially the same as the nonmanual work test of the administrative exemption, and that, since Mr. Grandits meets the one in support of the administrative exemption, he should also meet the other in support of the professional exemption. The court concluded that Mr. Grandits did meet the criteria for the nonmanual work test for his Grade 13 Import Specialist work, because he performs predominantly nonmanual work, which is both intellectual and varied. Both the nonmanual work test of the administrative exemption and the intellectual and varied work test of the professional exemption contain common language: the work for both tests must be predominantly "intellectual and varied in nature." 5 C.F.R. § 551.206(b); 5 C.F.R. § 551.207(b). Plaintiff acknowledges that Mr. Grandits meets the intellectual and varied work test of the professional exemption for the Grade 13 level, but disputes the other tests required for a professional exemption: the discretion and independent judgment test and the primary duty test.

### 2. Discretion and Independent Judgment Test

The language of the "discretion and independent judgment test" not only has the same name for both the administrative exemption and the professional exemption, but the language of the two tests is identical: "The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work." 5 C.F.R. § 551.206(c); 5 C.F.R. § 551.207(c). The court previously found that the work performed by Mr. Grandits as a Grade 13 Field National Import Specialist requires skill and knowledge, but not the requisite level of discretion and independent judgment, given the comprehensive, detailed and required Customs laws, regulations, procedures, and schedules, with which Mr. Grandits as well as Import Specialists in lower grades acknowledged to be exempt by Customs must com-

---

**19.** The omitted language under the primary duty test of the professional exemption addresses "artistic endeavor that is original or creative in nature," and also "[w]ork that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering or other similar work in the computer software field," neither of which are applicable to the present case. 5 C.F.R. § 551.207(a)(2), (3) (Jan. 1, 2005). Nor has defendant argued the applicability of either theory.

**20.** The 1999 and 2005 OPM regulations on the professional exemption contain a section under the primary duty test not contained in OPM's 1989 regulations addressing "highly-specialized knowledge in computer systems analysis, programming, and software engineering or other similar work in the computer software field," which is not applicable in the present case. 5 C.F.R. § 551.207(a)(3) (Jan. 1, 2005).

ply. For the same reasons cited above for the administrative exemption, defendant has failed to demonstrate that Mr. Grandits' work as a GS–13 involves sufficient discretion and independent judgment for a professional exemption. Failure to meet this test alone dooms the professional exemption. Nevertheless, because Mr. Grandits is a representative plaintiff, and in the interest of a complete record, the primary duty test of the professional exemption will be reviewed.

### 3. *Primary Duty Test*

OPM regulations state that the primary duty test is met if the employee's work consists of:

> Work that requires knowledge in a field of science or learning customarily and characteristically acquired through education or training that meets the requirements for a bachelor's or higher degree, with major study in or pertinent to the specialized field as distinguished from general education; or is performing work, comparable to that performed by professional employees, on the basis of specialized education or training and experience which has provided both theoretical and practical knowledge of the specialty, including knowledge of related disciplines and of new developments in the field . . . .

5 C.F.R. § 551.207(a)(1) (highlighting the second part of the test relied on by defendant). The OPM regulations do not further define "professional employee," other than to refer to section 207, quoted above. *See* 5 C.F.R. § 551.104.

### a. *Specialized Education or Training and Experience*

Defendant does not argue or rely on the first part of the above test, involving knowledge "customarily and characteristically acquired through education or training that meets the requirements for a bachelor's or higher degree," 5 C.F.R. § 551.207(a)(1), and there is no evidence in the record before the court in support of this first part of the test. Defendant relies on the second part of the above test, involving knowledge gained through "specialized education or training and experience which has provided both the-

oretical and practical knowledge of the specialty, including knowledge of related disciplines and of new developments in the field." *Id.*

In support, defendant cites the decision in *National Treasury Employees Union (NTEU) and Federal Deposit Insurance Corp. (FDIC)*, 53 F.L.R.A. 1469, 1998 WL 102178 (1998). In the *NTEU* case, bank liquidators and bank examiners at the GS–11 and above level challenged their professional exemption from the FLSA. *Id.* at 1470. The Federal Labor Relations Authority (FLRA) examined the same half of the primary duty test for the professional exemption defendant attempts to rely on in the present case, involving specialized education or training, and found that the primary duty test, and ultimately the professional exemption, were satisfied. *Id.* at 1478, 1480–81. The FLRA enumerated the training program for the bank liquidators and bank examiners in *NTEU* which passed muster for the exemption:

> First, with respect to training, promotion to a GG–11 level examiner position requires, among other things, completion of the Agency's Core Safety and Soundness Training Program, which in turn includes a total of 10 weeks of formal classroom training, along with other formal training classes. The Arbitrator specifically found, and it is not disputed, that these training programs are "designed to update and expand information [on] how to understand and treat the dynamic, creative and sometimes ingenious . . . ways banks got into trouble before they failed." As such, these programs provide an examiner with both theoretical knowledge about failing banks and practical knowledge regarding how to deal with those banks.

The Arbitrator also found that the training program requires examiners to complete an "independent development plan" and successfully complete comprehensive exams. In addition, testimony before the Arbitrator established that the Agency requires examiners to attend " 'building block' courses in 'centralized' training"; uses mentors to train; and uses "outside experts to keep commissioned bank exam-

iners abreast of dynamic changes in the industry." Moreover, the Arbitrator found that this training provides GG–11 examiners with the skills that satisfy the following theoretical and practical requirements for their position: [a GG–11 examiner must be] thoroughly informed as to banking theory and practice, banking and commercial law, economics, business administration and accounting; and possess qualitative judgment and the ability to analyze credits and accurately appraise all types of loans, securities, other categories of assets and liabilities, evaluate capital adequacy and the quality of bank management.

*Nat'l Treasury Employees Union (NTEU) and Fed. Deposit Ins. Corp. (FDIC)*, 53 F.L.R.A. at 1478–79 (citations omitted) (alterations in original).

In comparison, the training Mr. Grandits and other Import Specialists received does not appear to be nearly as extensive. The parties have stipulated that Import Specialists attend a "basic," six-week training course during their first year of employment. In his deposition, Mr. Grandits stated that the initial training "related to the basic occupational requirements of an import specialist, which entail classification, value, value to other Government agency requirements, the whole plethora of responsibilities as an import specialist." Mr. Lipp, in his deposition, stated that the initial training for newly hired Import Specialists "covers the whole range of subjects that import specialists would be involved in or could encounter in their return to the port, starting on classification principles, appraisement principles, other agency laws and regulations, specialized trade programs, dumping, countervailing duties, some computer training, some exposure to the various computer systems, ACS, Text, Data Query." Mr. Lipp also was asked:

Q. [plaintiff's attorney] As import specialists move on the grade scale from 5 to 7 to 9 to 11, is any additional training required?

A. [Mr. Lipp] From the 5 to 11, no.

\* \* \* \* \* \*

Q. [plaintiff's attorney] Is any additional training required to achieve the GS–12 team leader import specialist position?

A. [Mr. Lipp] No training is required. The import specialist is promoted into that position. That's a promotion opportunity based on merit promotion.

The parties stipulated, however, that Import Specialists at Grades 11, 12 and 13 attend seminars. During his deposition, Mr. Lipp stated that:

Q. [plaintiff's attorney] You mentioned that sometimes some of the import specialists are sent out to seminars. Who conducts those seminars?

A. Those seminars are conducted by the national import specialist.

Q. And where are they conducted?

A. At various locations. I can honestly say that the seminars have taken place in Buffalo. We had a national import specialist come to Buffalo and give a training seminar, and in conjunction with that import specialists would come in from different ports in the country and we have sent import specialists to training seminars, commodity seminars, I'm sorry, not particularly training, but they do cover that in Los Angeles, in Miami, in just about any city in the country, San Francisco.

Q. How recent was the one that was held in Buffalo?

A. That was years ago. I mean, that had to be seven, eight years ago.

The parties agreed that Import Specialists, including Mr. Grandits, acquire their expertise primarily through on the job training, and possibly through attendance at occasional seminars. However, unlike the more structured and rigorous training process described in the *NTEU v. FDIC* case, after the initial, basic course, training for Import Specialists in Customs appears to be more of a time-permitting, "catch-as-catch-can" affair, rather than a mandatory training program.

Similarly, the primary duty test for the professional exemption in Department of Labor regulations speaks of a "prolonged course" of study:

(1) Work requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a

general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes ....

29 C.F.R. § 541.3(a)(1) (emphasis added). The record in the present case does not reflect a required, prolonged course of study, but only reflects intermittent, as-time-permits, space-available seminars.

Defendant argues that the primary duty test of the professional exemption can be met by the additional consideration of Mr. Grandits' "experience." The OPM regulations speak of the performance of work based on both "specialized education or training *and* experience which has provided both theoretical and practical knowledge of the specialty, including knowledge of related disciplines and of new developments in the field ...." 5 C.F.R. § 551.207(a)(1) (emphasis added). In this regard, defendant again cites the *NTEU v. FDIC* case, which concluded that:

> operating as an examiner for 3 years during which there is constant supervision and training, constitutes 'experience,' which has provided the [bank] examiner with the knowledge that is the basis for a GG–11 examiner's ability to perform his or her work. [5 C.F.R. § 551.207(a)(1).] In sum, we find that GG–11 examiners perform their work on the basis of extensive training and 3 years of experience as an examiner trainee. This training and experience provides GG–11 examiners with "both theoretical and practical knowledge of [their] specialty, including [as found by the Arbitrator] knowledge of related disciplines and of new developments in the field[.]" [5 C.F.R. § 551.207(a)(1).]

*Nat'l Treasury Employees Union (NTEU) and Fed. Deposit Ins. Corp. (FDIC)*, 53 F.L.R.A. at 1480. The FLRA in the *NTEU v. FDIC* case described a formalized, structured, rigorous, on-the-job training program not reflected in the record of the present case. In *NTEU v. FDIC*, "training that is akin to 'specialized intellectual instruction and study' is relevant to determining wheth-

er an employee is a professional under the DOL regulations." *Id.* The record in the present case does not reflect training that meets the standard of "theoretical and practical knowledge of the specialty, including knowledge of related disciplines and of new developments in the field," as required by the primary duty test of the professional exemption. 5 C.F.R. § 551.207(a)(1).

Defendant also cites the case of *Kitty Hawk Air Cargo, Inc. v. Chao*, 304 F.Supp.2d 897, 901, 902 (N.D.Tex.2004), for the proposition that an employee may be found to be an exempt professional even though not in possession of a college degree. In *Kitty Hawk*, the United States District Court noted the extensive training and knowledge of pilots, and found that air cargo pilots were exempt from the FLSA under the professional exemption. *Id.* at 903–03 (citing *Paul v. Petroleum Equip. Tools Co.*, 708 F.2d 168, 172–73 (5th Cir.1983)) (a pilot with an airline transport (ATP) certificate and several Federal Aviation Administration (FAA) licenses had the requisite "advanced knowledge" for the professional exemption; in drawing this conclusion, the Fifth Circuit considered FAA regulations which enumerate the extensive training and experience necessary to obtain the commercial license and instrument rating, and discussed the various preliminary, in-class, and in-flight requirements for the commercial license and instrument rating), *reh'g denied*, 714 F.2d 137 (5th Cir.1983) (table) and *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 525 (5th Cir.1999) (athletic trainers satisfied the "learned prong" of the professional exemption; the mandatory state licensing of athletic trainers required a bachelor's degree; 1800 hours of apprenticeship over a three-year period; completion of five college courses in human anatomy, health, kinesiology, physiology and athletic training; and a cardiopulmonary resuscitation test), *reh'g denied*, 199 F.3d 441 (5th Cir.1999) (table), *cert. denied*, 529 U.S. 1020, 120 S.Ct. 1423, 146 L.Ed.2d 314 (2000).[21]

---

21. Defendant also cites several OPM decisions, rendered by FLSA Claims Officers in support of its professional exemption argument. None of the OPM decisions involve Import Specialists.

Regarding specialized training and experience, the opinions are work task and case-specific, as well as conclusory, such that it is difficult to draw lessons for the present case. *See, e.g.*, OPM

The Fifth Circuit in *Owsley,* discussing the professionally exempt pilots in *Paul,* stated that: "Even though the pilots did not obtain a college degree, their 'extensive knowledge of aerodynamics, airplane regulations, airplane operations, [and] instrument procedures' convinced us that their training was as complex as that of 'nurses, accountants, and actuarial computants' who are regarded as employees in learned professions." *Owsley v. San Antonio Indep. Sch. Dist.,* 187 F.3d at 525 (alteration in original) (quoting *Paul v. Petroleum Equip. Tools Co.,* 708 F.2d at 172–73); *see also Kitty Hawk Air Cargo, Inc. v. Chao,* 304 F.Supp.2d at 901.

The above reference in *Owsley* to employees in certain "learned professions" (nurses, accountants and actuaries), 5 C.F.R. § 541.301(a), comes from the DOL regulations, which provide a list of professions that, "generally speaking," 5 C.F.R. § 541.301(e)(1), meet the requirement for a prolonged course of specialized intellectual instruction and study:

> law, medicine, nursing, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical, and biological sciences, including pharmacy and registered or certified medical technology and so forth. The typical symbol of the professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not universal) prerequisite. In the case of registered (or certified) medical technologists, successful completion of 3 academic years of preprofessional study in an accredited college or university plus a fourth year of professional course work in a school of medical technology approved by the Council of Medical Education of the American Medical Association will be recognized as a prolonged course of specialized intellectual instruction and study. Registered nurses have traditionally been recognized as professional employees by the [Wage and Hour] Division in its enforcement of the act. Although, in some cases, the course of study has become shortened (but more concentrated), nurses who are registered by the appropriate State examining board will continue to be recognized as having met the requirement of § 541.3(a)(1) of the regulations.

29 C.F.R. § 541.301(e)(1).

The record does not reflect that Import Specialists possess the professional indicia used to distinguish members of the above professions. The record does not reflect, for example, that Import Specialists require an academic degree, or some sort of accreditation, certification or licensing, or a mandatory, prolonged course of specialized intellectual instruction and study, or even a mandatory minimum number of courses or training hours beyond the basic course which all Import Specialists, including exempt grades, complete. That is not to take away from the skilled work performed by employees who do not qualify for the professional exemption. But as the DOL regulations note, "just as an excellent legal stenographer is not a lawyer, these technical specialists must be more than highly skilled technicians [for the professional exemption]." 29 C.F.R. § 541.301(e)(2); *see also Vela v. City of Houston,* 276 F.3d 659, 675 (5th Cir.2001) (emergency medical tech-

Decision No. F–0334–12–01, dated April 9, 2002 (a GS–0334–12 Electronics Technician was found to have met the professional exemption: "Our interviews with the claimant and the claimant's supervisor disclosed that the claimant's work is of a specialized and technical nature. The claimant's work requires substantial specialized knowledge of the AIS computer system and of the principles, techniques, practices, and procedures associated with computer systems. The claimant's knowledge was acquired through considerable on-the-job training and experience and is equivalent to the professional knowledge characteristically acquired through specialized academic education."); OPM Decision No. F–0457–

11–01, dated June 28, 2002 (a GS–0457–11 Soil Conservationist in the United States Department of Agriculture was found to have met the professional exemption: "The claimant applies a wide range of soil and water conservation principles, methods, and techniques to analyze and evaluate complex natural resource factors and interpret related social and economic conditions. In addition, he devises and implements comprehensive, integrated resource conservation plans. Such knowledge is characteristically acquired through specialized academic education of soil and water conservation principles, methods, and techniques.").

nicians (EMTs) and paramedics did not satisfy the educational requirements for the learned professions exemption: city regulations did not require a college degree; the city required EMTs to complete 200 hours and paramedics 880 hours of specialized training, clinical experience, and field internship); *Rutlin v. Prime Succession, Inc.,* 220 F.3d 737, 742 (6th Cir.) (a funeral director/embalmer was found to be professionally exempt from the FLSA because, although a bachelor's degree was not a prerequisite, he was required to be licensed by the state, which required a year of mortuary science school; two years of college, including classes in chemistry and psychology; a national board test, which covered embalming, pathology, anatomy, and cosmetology; practice as an apprentice for one year, as well as a state examination), *reh'g and suggestion for reh'g en banc denied* (2000); *Quirk v. Baltimore County, Maryland,* 895 F.Supp. 773, 785 (D.Md.1995) (the county required Cardiac Rescue Technicians to complete 600 hours of training: 120 hours of classroom instruction, 80 hours of supervised clinical training, and another 400 hours of training or the equivalent of an additional 42 college credits; this specialized training was considered insufficient for the professional exemption); *Hashop v. Rockwell Space Operations Co.,* 867 F.Supp. 1287, 1296 (S.D.Tex.1994) ("[P]rofessionals must acquire their advanced knowledge through a 'prolonged course of specialized intellectual instruction and study.' 29 C.F.R. § 541.301(d). In the vast majority of cases, such a course of study must be a *prerequisite* to entry into the field in question. *Id.* Thus, broadcast journalists are not 'professionals' for FLSA purposes because the study of journalism is not required to become a competent journalist.") (emphasis in original; citations omitted); with regard to *Hashop v. Rockwell Space Operations Company, see also* 29 C.F.R. § 541.301(d): The professional exemption "does not include the members of such quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training."

Mr. Grandits' work does not require a bachelor's degree, accreditation, certification or licensing. His work does not involve a mandatory, prolonged course of specialized intellectual instruction and study, or a mandatory minimum number of courses, or training hours beyond the basic course which all Import Specialists, including exempt grades, complete. In sum, Mr. Grandits' work does not require the sort of mandatory, structured, rigorous, prolonged and specialized study which rises to the level of the professional exemption.

### b. *Work Comparable to that Performed by Professional Employees*

In order to be classified as nonexempt, in addition to a requirement to meet the "specialized education or training and experience" test (*see* 5 C.F.R. § 551.207(a)(1)), OPM regulations additionally require that the employee perform work "comparable to that performed by professional employees," *id.,* to qualify for the professional exemption. Defendant must demonstrate both elements for success on the primary duty test of the professional exemption. The court has found above that Mr. Grandits does not meet the "specialized education or training and experience" test. As for the second element, in its initial brief, defendant argues that Mr. Grandits' work is comparable to that of a private sector Customs Broker, one who transacts customs business on behalf of others. 19 C.F.R. § 111.1 (Apr. 1, 2004). Defendant's theory is that the GS–13 Field National Import Specialist (FNIS) reviews entries filed by Customs Brokers, therefore, the "professional" whose work is closest to the FNIS is the Customs Broker. Defendant cites the "[Customs] Broker Management Handbook" for the proposition that: "[T]he Customs broker is a highly knowledgeable professional." The Customs Broker does the initial classification to be submitted to the Import Specialist and the Import Specialist may interact with and review the Custom Broker's submission, but defendant provides no support for the conclusion that the Customs Broker meets the FLSA test for professional exemption, other than the layman's reference in the above Customs handbook, which does

not address the regulatory requirements for a professional exemption under the FLSA.

The Customs Broker, unlike the Import Specialist, is required to be licensed. 19 U.S.C. § 1641(b)(1), (6); 19 C.F.R. § 111.4. To obtain a Custom Broker's license, an individual must be a United States citizen, twenty-one years of age, of good moral character, and must attain a passing grade (75 percent or higher) on a written examination. 19 U.S.C. § 1641(b)(2); 19 C.F.R. § 111.11(a). Although there is no requirement for a bachelor's degree, or a mandatory minimum number of courses or training hours, or of a mandatory, prolonged course of specialized intellectual instruction and study for a Customs Broker, there is the written examination and the licensing requirement. Even assuming that the Customs Broker and Import Specialist perform comparable work, there is an open issue as to whether a Customs Broker could meet the primary duty test of the professional exemption. Furthermore, significant distinctions between the Customs Broker and the Import Specialist would still remain, based, for example, on the fact that the Customs Broker initially selects the applicable tariff classification from the complex Tariff Schedule, and the examination and licensing requirements to become a Customs Broker. If the Customs Broker could meet the professional exemption, it would be because of these differences from the Import Specialist.

In a subsequent brief, defendant also argues that Mr. Grandits' work is similar to work performed by Attorneys, because Mr. Grandits drafts explanations for his classification of exports, drawing upon law, regulation and precedent. DOL regulations list law as one of classic professions, as to which an exemption will normally be justified. 29 C.F.R. § 541.300. However, the DOL regulations also note that, "just as an excellent legal stenographer is not a lawyer ... technical specialists must be more than highly skilled technicians." 29 C.F.R. § 541.301(e)(2). The record reflects that Mr. Grandits may be highly, technically skilled, but defendant has not demonstrated sufficient comparability between the legal profession and the Import Specialist.

Defendant further argues that Mr. Grandits' work is similar to the work of Research Analysts, Security Analysts, Public Relations Specialists, and Accountants. DOL regulations cite accounting as a profession that, generally speaking, meets the requirement for a prolonged course of specialized intellectual instruction and study. 29 C.F.R. § 541.301(e). However, the DOL regulations further state that Certified Public Accountants (CPA) will normally meet the requirements of the professional exemption, but that Accounting Clerks, Junior Accountants, and other Accountants may not. 29 C.F.R. § 541.301(f). Defendant does not make the same distinction the DOL regulations makes between types of accountants, and does not demonstrate how the work of, for example, a CPA is comparable to the work of an Import Specialist.

The other examples of analysts and specialists cited by defendant are not in the DOL list of professions, nor has defendant demonstrated that, for example, an individual working in Public Relations meets the professional exemption of the FLSA. As noted above, technical specialists must be more than highly skilled technicians in order to qualify for the professional exemption. 29 C.F.R. § 541.301(e)(2). Nor has defendant demonstrated how the Public Relations work or the work of the other analysts/specialists is sufficiently comparable to that of an Import Specialist. Defendant largely assumes the above-cited jobs would meet the professional exemption, then further assumes, without adequate discussion or details or argument, that the jobs are comparable to the Import Specialist. Defendant has not demonstrated either that Mr. Grandits is performing work comparable to that performed by professional employees, or that Mr. Grandits' work is based on specialized education or training and experience which provided him theoretical as well as practical knowledge. 5 C.F.R. § 551.207(a)(1). Based on the information in the record before the court, provided by the parties, Mr. Grandits does not meet the primary duty test of the professional exemption. Earlier, the court found that Mr. Grandits did not meet the discretion and independent judgment test for

the professional exemption. Failure to satisfy either test, alone, is fatal to the professional exemption.

## CONCLUSION

For the foregoing reasons, the defendant's motion for partial summary judgment on liability is **DENIED**. Defendant has the burden of proof to satisfy multiple tests in order to demonstrate the applicability of the administrative or professional exemptions, with the exemptions themselves required to be construed narrowly. *See* 5 C.F.R. § 551.202(b), (c). For all the reasons discussed in this opinion, defendant has not demonstrated that Mr. Grandits meets the criteria for either the administrative exemption in either the GS–12 or 13 grades, or the professional exemption in the GS–13 grade, and has not overcome the presumption that Mr. Grandits is a nonexempt employee. *See* 5 C.F.R. § 551.202(a), (d). The distinctions between exempt and nonexempt employees are not based on the intelligence required, nor on the level of experience or dedication attained by the employee. The distinction is one established by the employer when setting the discretion and requirements for the job, the actual job duties and the training, both required and provided. Although the plaintiff is performing an important and skilled job, and his experience continues to increase the level of his performance, the taskings as a GS–12 and 13 have not been so different from those of the GS–5 through 11 employees who perform similar tasks. Those additional tasks described in the position description for the GS–12 and 13 are either not sufficient to meet the requirements of the administrative and professional exemptions or have not been demonstrated to be taskings Mr. Grandits actually performs with any frequency or regularity. The plaintiff's cross-motion for partial summary judgment on the issue of liability, reflecting entitlement to overtime under the FLSA, is **GRANTED**.

**IT IS SO ORDERED.**